FILED

**NOT RECOMMENDED FOR PUBLICATION**

MAR 0 2 2004

No. 02-3035

LEONARD GREEN, Clerk

INFORMATION COPY
MANDATE NOT YET ISSUED
DIS. CT. # _00-661_

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

04 MAR -3 PM 3: 57

MARK J. KELLY,                          )
                                        )
    Plaintiff-Appellant,            )
                                        )
                                        )    1: 00cv0661
                                        )
                                        )    ON APPEAL FROM THE UNITED
                                        )    STATES DISTRICT COURT FOR
v.                                      )    THE SOUTHERN DISTRICT OF
                                        )    OHIO
LAMBDA RESEARCH, INC.,                  )
                                        )
    Defendant-Appellee.             )

NOT RECOMMENDED FOR FULL-TEXT
PUBLICATION
Sixth Circuit Rule 28(g) limits citation to specific situations.
Please see Rule 28(g) before citing in a proceeding in a court
in the Sixth Circuit. If cited, a copy must be served on other
parties and the Court.
This notice is to be prominently displayed if this decision
is reproduced.

**BEFORE:    BOGGS, Chief Judge; KRUPANSKY and CLAY, Circuit Judges.**

**KRUPANSKY, Circuit Judge.**  The plaintiff-appellant, Dr. Mark J. Kelly ("Kelly"), has

assailed the trial court's award of summary judgment to his former employer, defendant-appellee

Lambda Research, Inc. ("Lambda"), by which his amended complaint stating claims arising under

federal and state law was dismissed with prejudice.  On review, Kelly has contested only the district

judge's dismissal of his employment retaliation and constructive wrongful discharge causes of action

founded respectively in the Ohio Whistleblower Statute and Ohio public policy.

During July 1998, Kelly, a Ph.D. research chemist, began working in Lambda's Cincinnati x-ray

diffraction laboratory, designated "Lab II."  In December 1998, Lambda elevated Kelly to Lab II

Supervisor. The Lab II employees, including Kelly, conducted research and gathered experimental data

concerning the physical properties and capabilities of materials and technical components for diverse

commercial, academic, and governmental customers, including the nuclear power industry.  At the time

of Kelly's retention by Lambda, its sole shareholder and managerial principal, Paul Prevey ("Prevey"),

No. 02-3035
*Kelly v. Lambda Research, Inc.*

informed the plaintiff that Lambda's practices conformed to all prevailing high-tech industry standards.

However, shortly after the plaintiff's promotion to management, he began to suspect either that certain

of Lambda's written standard operating procedures failed industry norms, or that Lambda's employees

often inadequately adhered to the company's internally-developed written procedures, thereby risking

inaccuracies in test results.

Nevertheless, during approximately his first year of employment with the defendant, Kelly

remained mute concerning his unverified suspicions of past and ongoing defective readings caused by

deficient laboratory procedures. In June 1999, his superior Prevey conducted Kelly's inaugural formal

written performance evaluation. Prevey praised Kelly for his management skills, responsiveness to

training, practical knowledge of x-ray diffraction, and future productive potential.

During that same month, a Lab II technician, Chris Barger ("Barger"), performed routine x-ray

diffraction crystallographic texture analyses on three zirconium alloy pipe cladding specimens, which

consisted of segments detached from sheets or tubes composed of heavy metallic insulating foil

designed to encase nuclear fuel lines, for General Electric's Nuclear Division ("GEND"). If the

laboratory results reflected capabilities within the expected range, the subject zirconium foil tubing

material would be installed on fuel rods in industrial nuclear reactors at commercial power plants, which

function as delivery conduits for enriched uranium fuel pellets.[1] However, after reviewing Lambda's

June 10, 1999 laboratory report, a GEND employee, Charles McKinney, concluded that one critical

---

[1]At deposition, the plaintiff explained:

> Zirconium tubes are used as cladding materials for nuclear fuel rods, used in nuclear reactors, a little bit redundant there. In any case, the texture correlates with strength of the material and then also with stress corrosion, cracking under some circumstances.

No. 02-3035
*Kelly v. Lambda Research, Inc.*

piece of research datum – the "pole figure" measurement – for zirconium tube specimen no. 986985-01 was flawed, which in turn distorted the texture analysis result. He requested that Lab II investigate its experimental data extracted from that studied exemplar. Kelly's subsequent inquest exposed Lambda's lab technician's neglect to adhere to Lambda's pertinent written testing procedure 3P1066.02, in that, prior to testing, he misapplied contact cement and epoxy to secure the sample to the glass mounting surface.   Consequently, Barger had failed to ensure that the examined sample remained flat on the mounting glass plate during testing, which had skewed the research data.   When properly re-tested according to the defendant's standard written procedure, the tubing sample in controversy yielded results within the expected range.   Subsequently, on June 10, 1999, via a letter accompanied by a research report, Lambda reported to GEND that its initial anomalous result had been the product of "sample mounting error" committed by the technician.

Although the GEND incident was evidently attributable to a detected human error which had been corrected, Kelly nonetheless concluded that Lambda's written standard operating procedures for the "pole figure" testing of zirconium tubing might be inherently flawed, and thus could yield, or in the past may have yielded, unreliable data in *any* instance, irrespective of the technician's verbatim adherence to Lambda's procedural instructions. In the complainant's opinion, those procedures, which required "sample flatness" to be within 0.002 inches but which did not specify any technique for measuring flatness beyond visual inspection, did not, as a practical matter, demand adequate sample flatness, because zirconium foil tubing tends to "buckle" and thence become "wavy" and/or "rough" if not properly flattened and stabilized; and further because, in his words, "I can't tell what flatness to within 0.002 inches looks like."

- 3 -

No. 02-3035
*Kelly v. Lambda Research, Inc.*

Consequently, Kelly worried that an unknown number of past zirconium alloy test measurements may have been misleading because of such flatness irregularities which potentially had been undetected and/or uncorrected *irrespective* of the company's application of its standard testing procedures. In turn, Kelly feared that some nuclear reactor's fuel line wrapped with unidentifiable mis-analyzed zirconium foil tubing might someday pose a significant public safety hazard and/or menace to human health, should a malfunction cause a toxic radiation leak, because he knew that some of GEND's *past* purchase orders for zirconium tube testing (but *not* the May 1999 GEND service order for the tube testing at issue) had displayed a nuclear safety warning.[2] *See generally* 10 C.F.R. 21 (codifying the NRC's regulations governing the "Reporting of Defects and Noncompliance" by suppliers of materials and services to the nuclear power industry).

Accordingly, in July 1999, Kelly recommended to Prevey that GEND be notified of his concerns, so that the customer could evaluate possible risks and/or consider corrective alternatives. Prevey instructed Kelly to memorialize the zirconium testing issue and his corrective recommendation(s) in a written internal Quality Assurance Incident Report ("QA Report"). Kelly completed his QA Report on July 16, 1999, through which he again advised Prevey that Lambda should,

---

[2]GEND's boilerplate advisory informed suppliers of nuclear energy components or related services that 10 C.F.R. 21 requires, *inter alia*, that the supplier inform the buyer (GEND) of any defect or noncompliance with a purchase or design specification which could contribute to a significant radiological hazard; and further to advise the purchaser of any defect or noncompliance which could have an effect unknown to the provider, so that GEND can assess the potential hazards posed. *See* 10 C.F.R. § 21.21 (outlining a nuclear industry supplier's duty to notify the buyer of its failure to comply with standards, or of the existence of a defect, if that failure or defect "could create a substantial safety hazard, were it to remain uncorrected;" or if a deviation from, or failure to comply with, standards exists, but "the supplier determines that it does not have the capability to perform the evaluation to determine if a defect exists, then the supplier must inform the purchasers or affected licensees within five working days of this determination so that the purchasers or affected licensees may evaluate the deviation or failure to comply.").

In some instances, willful violations of 10 C.F.R. 21 may trigger criminal penalties. 10 C.F.R. § 21.62.

- 4 -

No. 02-3035
*Kelly v. Lambda Research, Inc.*

among other things, alert GEND that its past "pole figure" texture analysis research data on zirconium

insulation specimens might be unreliable. Kelly further opined that such an advisory was compelled

by 10 C.F.R. 21. He also suggested that the technicians should not rely solely on eyesight to verify that

a sample is pressed and cemented completely flat on the glass plate testing surface; rather, "a

measurement or verifiable criteria for surface flatness" should be established to avoid distortions in the

test readings.

However, Prevey redacted Kelly's report by striking his recommendation that Lambda inform

GEND that *all* of its previously-furnished "pole figure" data collected in past zirconium texture analyses

was questionable; Prevey instead substituted his own handwritten notation to the effect that GEND *had*

*already been notified* that Lambda had collected atypical textural data in the past because of a sample

mounting deficiency.[3] Prevey also deleted Kelly's recommendation that Lambda's sample mounting

procedures be improved, but he retained Kelly's advisory that Lambda's technicians and engineers

should receive additional training to ensure that they execute the standard procedures properly.

Thereafter, Kelly produced a second QA Report, dated August 26, 1999, concerning the June

1999 incident involving GEND specimen number 986985-01. He reiterated therein his observations

and recommendations concerning the "sample flatness" procedural question. Kelly testified that Prevey

became enraged when presented with his August 26, 1999 report, and demanded, in high-decibel

language punctuated by profanity, to know why his modifications to Kelly's July QA Report were not

---

[3]At deposition, Prevey conceded that, contrary to his revision to Kelly's QA Report, Lambda had *not* informed
GEND of the procedural defects in Lambda's mounting process alleged by Kelly. Prevey explained that he had confused
that issue with a previously-discovered unrelated procedural data-collection flaw concerning the ninety-degree-rotation
of samples during testing.

*No. 02-3035*
*Kelly v. Lambda Research, Inc.*

reproduced in Kelly's August report. According to Kelly, when he explained that, contrary to the statement added by Prevey to the July 1999 report, GEND in fact had *never* been apprised of the long-term procedural "sample flatness" testing problem, but instead had been alerted only to the unrelated "ninety-degree-rotation" issue, Prevey firmly instructed Kelly not to expend any more company time on his flatness-perfection crusade, nor to discuss the matter with anyone under penalty of dismissal.

The plaintiff has claimed that, following his August 1999 confrontation with Prevey, Prevey's behavior towards him deteriorated, in that he regularly demeaned and antagonized Kelly, and allegedly threatened to discharge him because of various unrelated incidents. Unbeknownst to Kelly until revealed by litigation discovery, on September 6 and 14, 1999, Prevey added two critical memoranda to Kelly's personnel file. On September 28, 1999, Prevey conducted Kelly's second annual routine performance review. Prevey reduced Kelly's quality marks in eight of thirteen evaluative categories. Kelly has further averred that, also in September 1999, Prevey threatened to shoot him if he persisted in his campaign to pressure Lambda into notifying GEND of his personal conclusion that Lambda had used substandard "pole figure" testing techniques for an extended period, although Kelly has conceded that he believed that Prevey was speaking figuratively and had not intended in September 1999 to menace him with literal gunshot-inflicted death or bodily harm.

On September 12, 1999, without Prevey's knowledge and contrary to his orders, Kelly wrote to the United States Nuclear Regulatory Commission ("NRC") to express his safety concerns stemming from his conviction that Lambda's standard "pole figure" testing procedures for zirconium covering tubes were sufficiently faulty to yield unreliable results, and that Lambda was illegally concealing that problem from its clients. Thereafter, Kelly spoke by telephone on at least two occasions (September

- 6 -

*No. 02-3035*
*Kelly v. Lambda Research, Inc.*

30 and October 9, 1999) with NRC investigators, and met on October 27, 1999 with an NRC agent for

a personal interview.

Subsequently, the NRC consulted two technical experts in the zirconium texture analysis field,

both of whom concluded "that texture analysis, alone, cannot be used to determine the intrinsic

mechanical properties of zirconium-based tubing material. Rather, as one expert suggested, texture

analysis can be used to estimate mechanical properties relative to certain directions of the tubing (e.g.,

the results of a texture analysis may show that the tensile strength of the tube in the axial direction is

larger, or smaller, than the tensile strength in the radial direction)."

On December 16, 1999, the NRC mailed to Kelly its comprehensive report and analysis of its

investigative findings, coupled with a cover letter which summarized its conclusions. Among other

things, the cover letter recited:

> Based on our review and the information obtained from the experts, we believe that the
> problems with Lambda Research texture analysis may be attributed to poor control of
> specimen preparation and texture analysis procedures. Further, we believe that texture
> analyses, in general, cannot be used to inadvertently qualify unacceptable material. The
> intrinsic mechanical properties of zirconium-based tubing material cannot be determined
> from texture analysis. Therefore, we have concluded that errors resulting from the
> texture analysis at Lambda Research in the development of engineered components is
> not a safety concern. NRC did not pursue the issue further since we determined it is not
> a safety concern.

The NRC's letter advised Kelly that "[u]nless the NRC receives additional information that suggests

our conclusions should be altered, we plan no further action on this matter."

Kelly had no further contact with the NRC thereafter. Nonetheless, without evident justification,

the plaintiff remained steadfast in his conviction that Lambda's testing procedures invited research data

No. 02-3035
*Kelly v. Lambda Research, Inc.*

errors which could ultimately affect the safety of nuclear fuel rods.[4]  However, Kelly remained silent

---

[4]In relation to the NRC letter and report, Kelly asserted via affidavit:  "This removed my immediate fears of safety hazards caused by qualification of bad materials in safety critical applications due to bad texture analysis data. However, my concerns about use of bad texture analysis data in engineering studies used in design or development of nuclear reactor safety related components or other activities were unresolved."

The plaintiff has posited that his ongoing concerns were buttressed by his earlier professional experience as an employee of the General Electric Aircraft Engines Division, which led him to conclude that faulty material texture analysis can mislead engineers into overestimating the useful lifespan of that material in specific stressful applications; matched with the NRC's observation in its analytic report that "[w]e are unsure how GE Nuclear or Lambda Research's other clients use the texture analysis results."  However, as the district court correctly remarked, the cited passage from the NRC's report, taken in full proper context, indicated that the precise use to which nuclear energy clients put Lambda's texture analysis data is *irrelevant*, because, as stated in the NRC's letter, in *any* nuclear industry usage, erroneous texture analysis of the zirconium encasement on fuel rods will not have adverse safety consequences.  Likewise, given the NRC's analysis and expert conclusions, the plaintiff's opinion that erroneous zirconium texture analysis results could have negative safety ramifications when that inaccurately-tested material is installed in a jet aircraft engine is facially immaterial to the potential hazards, or lack thereof, of that same material when applied as cladding to a nuclear fuel rod in an atomic reactor.  Moreover, the NRC's letter in effect informed Kelly that, unless he provided it with additional information which would discredit its conclusion that no safety risk was posed by any zirconium nuclear fuel rod cladding which Lambda may have incorrectly tested for "pole figure" data, it would consider the case closed. Kelly made no effort to persuade the NRC that any valid safety concern remained for further inquiry, whether based on his prior experience with aircraft engines, the precise applications of texture analysis information by Lambda's patrons, or any other factor(s) which had not been addressed in the NRC's report and/or letter.  Accordingly, as correctly found by the trial judge, the undisputed evidence, when construed most favorably for the plaintiff, revealed inescapably that, after approximately December 16, 1999, Kelly either did not have a reasonable belief that Lambda's assailed testing procedures posed any risk to public safety or human life, or that he knowingly had failed to notify the NRC of the complete accurate factual basis for his ongoing allegedly reasonable belief that Lambda's subject practices threatened a significant radiological hazard.

Additionally, Kelly has cited a passage from the testimony of Dr. Michael Glavicic ("Glavicic"), Kelly's erstwhile colleague and his successor as Lab II supervisor, which purportedly corroborated the engineering soundness of the plaintiff's continuing safety concerns post the NRC's December 16, 1999 report and letter.  However, Glavicic merely explained that GEND used zirconium texture analysis data as "an engineering parameter to relate the crystallographical structure of the tubes, which is related to the mechanical properties, which is inherently important," and opined that a potential safety problem might exist if an operational nuclear fuel rod coated with inferior zirconium tubing were to break.  However, even if that testimony could be reasonably construed as an expert opinion that faulty zirconium texture analysis data could cause engineering errors which could someday permit a ruptured nuclear fuel rod to leak hazardous radiation, the trial court record is absent any evidence that Kelly had discussed the matter with Glavicic at any time pertinent to the instant lawsuit (indeed, Kelly testified that Prevey had ordered him *not* to discuss the safety issue with anyone, including Glavicic), and therefore the plaintiff introduced no evidence that Glavicic's professional opinion contributed to Kelly's allegedly reasonable continuing belief, after December 16, 1999, that significant safety issues remained unresolved.  Nor did Kelly offer any proof that he had notified the NRC of Glavicic's contrary professional judgment and his scientific rationale for differing with the NRC's conclusion.  In any event, no record evidence indicated that Glavicic's conclusion that distorted zirconium analysis presented potential safety hazards was supported by any specific quantified experimental or engineering research results, as opposed to naked speculation loosely based on his general education and experience.  In counterpoint, the NRC report's analytic conclusion that no safety menace existed was the product of a specific investigation into the potential dangers posed by zirconium-cladded

No. 02-3035
*Kelly v. Lambda Research, Inc.*

on the matter between the end of September 1999 and February 16, 2000. On the latter date, Marie

Marawi ("Marawi"), the defendant's new Quality Assurance Manager, tendered a revised edition of

Kelly's August 26, 1999 incident report for his signature. That version was absent the two

recommendations which had most offended Prevey, namely that GEND should be informed of possible

data distortions and inaccuracies in *all* of Lambda's zirconium texture research results, and that

Lambda's testing procedures should be revised to correct chronic potential sample-flatness

irregularities.[5]

The following day, February 17, 2000, Prevey met with Kelly to discuss the sanitized report.

Kelly claimed that, when he refused to execute that allegedly misleading document, an enraged Prevey

"got into [his] face" in a physically intimidating manner, accused Kelly and his staff of deliberately

sabotaging lab test results, and announced that all salaries in Lab II would be "frozen." Subsequently,

on February 18, 2000, Prevey inserted two additional negative performance evaluations into Kelly's file,

although the plaintiff did not know of their existence until they were later produced in discovery.

Also on February 18, 2000, Prevey re-assigned some of Kelly's supervisory duties to Dr.

Glavicic. The plaintiff surmised that Prevey intended soon to remove him from management. Kelly

testified that, over the ensuing days, Prevey continually criticized his performance, and leveled angry

accusations of malfeasance and nonfeasance against him. Assuming that he would soon be confronted

---

fuel rods which had been inaccurately tested for "pole figure" properties, conducted by NRC consultants including "a senior engineer of one of the major nuclear fuel fabrication companies who has experience in texture analysis from a fuel cladding design perspective." By contrast, Kelly and Glavicic were research chemists; neither possessed engineering credentials.

[5]In February 2000, Lambda refined its texture analysis procedure to require that samples be stabilized by use of hot set epoxy instead of less reliable contact cement.

*No. 02-3035*
*Kelly v. Lambda Research, Inc.*

with the alternatives of either signing the edited and purportedly deceptive QA Report, or resigning his position, Kelly, on the evening of February 24, 2000, prepared an employment resignation letter. The following day, February 25, 2000, Prevey demanded that Kelly execute the revised QA Report immediately, without altering any part of its text. Ultimately, Prevey permitted Kelly to examine its contents for one hour. Upon the expiration of that interval, Kelly tendered Prevey his resignation letter in lieu of the signed incident report.

On August 15, 2000, the plaintiff instituted a five-count diversity complaint against Lambda,[6] by which he alleged Ohio law (1) employment retaliation in offense to the state Whistleblower Act, (2) constructive discharge and other retaliatory employment discipline contrary to state public policy, (3) intentional infliction of emotional distress, (4) breach of contract, and (5) misrepresentation. On January 31, 2001, Kelly lodged his first amended complaint, by which he added a sixth cause of action, for averred infringement of the federal Lanham Act, 15 U.S.C. § 1125 (creating a private right of action against persons who misrepresent certain facts in a commercial context). Following the close of discovery, the defendant moved for summary judgment on all counts. *See* Fed. R. Civ. P. 56. After full

---

[6]Plaintiff Kelly resides in Indiana. Defendant Lambda is an Ohio corporation having its principal place of business in Cincinnati, Ohio. The amount in controversy exceeded $75,000. *See* 28 U.S.C. § 1332.

No. 02-3035
*Kelly v. Lambda Research, Inc.*

briefing, the district judge, on December 4, 2001 granted that motion,[7] and dismissed each cause of

action with prejudice.  On January 2, 2002, Kelly noticed a timely appeal.

On review, the plaintiff has assailed only the dismissal of his first and second causes of action,

namely for (1) retaliation in employment in violation of the Whistleblower Statute, and (2) constructive

---

[7]"The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (brackets
added).

The familiar standards governing summary judgments have been summarized by this court as follows:

A court may grant summary judgment under Fed. R. Civ. P. 56 only if, after construing the
record evidence, and the reasonable inferences which may be drawn therefrom, most favorably for the
party opposing the motion, the proof could not support a judgment in favor of the nonmoving party.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "Credibility
determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts
are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and
all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255
(1986) (citation omitted).  *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S.
451, 456 (1992); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

All legal conclusions by lower courts are scrutinized *de novo. Grider v. Abramson*, 180 F.3d
739, 746 n.7 (6th Cir.), *cert. denied*, 120 S. Ct. 528 (1999); *Brennan v. Township of Northville*, 78
F.3d 1152, 1154, 1156 (6th Cir. 1996).  Hence, a lower court's summary judgment award is subject
to plenary review, because the sufficiency of the record evidence, construed most favorably for the
opponent of summary judgment, poses a question of law. *See Doe v. Claiborne County*, 103 F.3d 495,
505 (6th Cir. 1996).  The touchstone is "whether the evidence presents a sufficient disagreement to
require submission to a jury or whether it is so one-sided that one party must prevail as a matter of
law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (*quoting
Anderson*, 477 U.S. at 251-52).

*Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 556-57 n.7 (6th Cir. 2000) (ellipsis in
original).

It should be emphasized that courts charged with the duty of resolving a request for summary judgment should
assess *all* reliable relevant record evidence, not merely the evidence favorable to the non-moving party.  *See Reeves v.
Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (commenting that, in disposing of a summary judgment
motion, a court "must review the record '*taken as a whole*,'" which means "all of the evidence in the record." (emphasis
added) (*quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 242, 250-51 (1986)); *Aka v.
Washington Hospital Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (instructing that, when reviewing a summary
judgment, "the court must consider *all the evidence in its full context* in deciding whether the plaintiff has met his burden
of showing that a reasonable jury could conclude that he had suffered discrimination and accordingly summary judgment
is inappropriate.") (emphasis added).

No. 02-3035
*Kelly v. Lambda Research, Inc.*

discharge and other retaliatory employment discipline in violation of Ohio public policy. Because those

claims lie within the federal diversity jurisdiction, this court adheres to Ohio substantive law, including

the published edicts of the Ohio Supreme Court. *See, e.g., Rousey v. United States*, 115 F.3d 394, 397

(6th Cir. 1997) (instructing that *only* published dispositions of the forum state's highest Court bind

federal courts as precedential case law in diversity actions; by contrast, intermediate state court

decisions constitute, at most, "relevant data" to be considered by the federal court along with a host of

other materials if the state's highest Court has not resolved the pertinent question, thus requiring the

federal court to "predict" how the state Supreme Court would decide the issue).

The Ohio Whistleblower Law provides:

> If an employee becomes aware in the course of the employee's employment of
> a violation of any state or federal statute or any ordinance or regulation of a political
> subdivision that the employee's employer has authority to correct, and the employee
> reasonably believes that the violation either is a criminal offense that is likely to cause
> an imminent risk of physical harm to persons or a hazard to public health or safety or is
> a felony, the employee orally shall notify the employee's supervisor or other responsible
> officer of the employee's employer of the violation and subsequently shall file with that
> supervisor or officer a written report that provides sufficient detail to identify and
> describe the violation. If the employer does not correct the violation or make a
> reasonable and good faith effort to correct the violation within twenty-four hours after
> the oral notification or the receipt of the report, whichever is earlier, the employee may
> file a written report that provides sufficient detail to identify and describe the violation
> with the prosecuting authority of the county or municipal corporation where the
> violation occurred, with a peace officer, with the inspector general if the violation is
> within the inspector general's jurisdiction, or with any other appropriate public official
> or agency that has regulatory authority over the employer and the industry, trade, or
> business in which the employer is engaged.

Ohio Rev. Code § 4113.52(A)(1)(a).

Subsection (B) of section 4113.52 posits, *inter alia*, that except in cases of employee "bad faith"

(developed below), "no employer shall take any disciplinary or retaliatory action against an employee

No. 02-3035
*Kelly v. Lambda Research, Inc.*

for making any report authorized by division (A)(1) or (2) of this section, or as a result of the

employee's having made any inquiry or taken any other action to ensure the accuracy of any information

reported under either such division." Ohio Rev. Code § 4113.52(B). That subsection further specifies

that "disciplinary or retaliatory action by the employer" includes:

> (1) Removing or suspending the employee from employment;
> (2) Withholding from the employee salary increases or employee benefits to which the
> employee is otherwise entitled;
> (3) Transferring or reassigning the employee;
> (4) Denying the employee a promotion that otherwise would have been received;
> (5) Reducing the employee in pay or position.

*Id.*

Ohio law creates a civil cause of action for an employee who can prove that he or she satisfied

all the requisite elements of predicate "whistleblower" status, and further that his or her employer

subsequently disciplined or retaliated against him or her in a legally material manner "as a result of the

employee's having filed a report under division (A) of this section." Ohio Rev. Code § 4113.52(D); *see*

*also* § 4113.52(E). However, if the employee had failed to exert "a reasonable and good faith effort

to determine the accuracy of any information reported under division (A)(1) or (2) of this section . . .

the employee may be subject to disciplinary action by the employee's employer, including suspension

or removal, for reporting information without a reasonable basis to do so under division (A)(1) or (2)

of this section." Ohio Rev. Code § 4113.52(C).

"In order for an employee to be afforded protection as a 'whistleblower,' such employee must

*strictly comply* with the dictates of R.C. 4113.52. Failure to do so prevents the employee from claiming

*No. 02-3035*
*Kelly v. Lambda Research, Inc.*

the protections embodied in the statute." *Contreras v. Ferro Corp.*, 652 N.E.2d 940, 941 (Ohio 1995)

(syllabus).  (Emphasis added).

Kelly's evidence, when construed in the light most favorable to his case, cannot  carry that

demanding burden.  Even assuming *arguendo*, without deciding, that the plaintiff has sufficiently

evidenced acts of employment discipline and/or retaliation which fit into categories forbidden by the

Whistleblower Act, virtually all of the *significant* acts of discipline or retaliation allegedly imposed by

Lambda against Kelly, including those related to the February 17, 2000 confrontation between Prevey

and Kelly, the February 18, 2000 re-assignment of certain of Kelly's erstwhile Lab II supervisory duties

to Glavicic, and the plaintiff's February 25, 2000 alleged constructive discharge,[8] all occurred *after*

Kelly had received and studied the NRC's December 16, 1999 report and letter by which that agency

---

[8]For reasons illustrated herein, the plaintiff's case was properly dismissed irrespective of whether or not he had been "constructively discharged" on February 25, 2000. Nevertheless, because the plaintiff's averred constructive termination was the major punitive action allegedly exacted against him by Lambda, the instant court observes that, on the record evidence, Kelly was *not* constructively discharged as a matter of Ohio law. *See Mauzy v. Kelly Services, Inc.*, 664 N.E.2d 1272 (Ohio 1996) (syllabus ¶ 4) (dictating that constructive discharge exists in Ohio if working conditions were objectively "so intolerable that a reasonable person under the circumstances would have felt compelled to resign."). Kelly has offered absolutely no evidence that the overall working conditions at Lambda were so intolerable that an objectively reasonable person would have felt compelled to resign. Indeed, the record reflected that Kelly elected to resign on February 25, 2000 only because he refused to approve the edited version of his QA Report, from which two bits of his advice had been omitted: (1) that GEND and other clients of Lambda be notified that all of Lambda's zirconium texture analysis results were questionable because of faulty testing procedures, and therefore all zirconium tubing analyzed by Lambda was possibly safety-threatening; and (2) that Lambda should "correct" those procedural problems to avoid future safety hazards. However, by that date, the NRC had unequivocally informed Kelly that no safety hazard was posed by any inaccuracies in Lambda's zirconium texture analysis readings.

Accordingly, under those circumstances, an objectively reasonable person would not have concluded that his employer's demands that he execute a revised version of an incident report which omitted facially situation-inappropriate "advice" therefrom presented him with a demand so intolerable that he had no realistic option but to instead resign. To the contrary, all Kelly needed to do to keep his job was sign the document absent the inaccuracies which he had included in his original draft, which, for his own subjective personal reasons, he refused to do. Indeed, the Lab II technician Barger, who also experienced conflicts with Prevey over zirconium testing issues and had threatened to resign over them on prior occasions, immediately executed the revised incident report when asked by Prevey to do so, thus demonstrating compellingly that the demand was not objectively intolerable.

- 14 -

No. 02-3035
*Kelly v. Lambda Research, Inc.*

had articulated its final conclusion, based upon the carefully considered opinions of expert scientists and engineers experienced "in texture analysis from a fuel cladding design perspective" (*see* note 4 above), that absolutely no safety hazards were posed by Lambda's alleged practices which Kelly had faulted.

In light of that undisputed evidence and Kelly's admissions that the NRC's conclusion alleviated his "immediate fears," no reasonable jury could find that, on and after approximately December 16, 1999, the plaintiff reasonably believed that Lambda's practices, which had been the target of his complaints to management and his "whistleblower" report to the NRC, were risking human safety. After approximately December 16, 1999 (and arguably prior to that date), Kelly indisputably was *not protected when Lambda took the alleged retaliatory and disciplinary actions of February 2000 against him which were triggered by Kelly's continuing post-December 1999 engagement in "whistleblower"-related activities.*

Kelly has protested that Lambda had retaliated against him, and/or disciplined him, for his allegedly protected activity *prior to* December 16, 1999, when he at least arguably possessed a good faith belief that Lambda's zirconium cladding analysis procedures may have violated criminally-sanctioned federal safety regulations and thus may have threatened future physical harm to persons, *see Fox v. Bowling Green*, 668 N.E.2d 898 (Ohio 1996) (syllabus); and therefore his "whistleblower" claim should proceed to trial to that extent. However, Kelly has produced no evidence of any pre-December 16, 1999 retaliation or discipline by the defendant of a kind which could even debatably satisfy Ohio Rev. Code § 4113.52(B).

No. 02-3035
*Kelly v. Lambda Research, Inc.*

Instead, at best, the record reflected that prior to December 16, 1999, Prevey may have (1) treated Kelly rudely or with hostility because of Kelly's obsession with the alleged inadequacy of Lambda's steps to secure zirconium cladding specimens in a perfectly flat state during testing, (2) added two memoranda to his personal file without Kelly's knowledge which criticized Kelly's handling of the matter, and (3) reduced Kelly's formal annual performance ratings in September 1999 relative to his prior annual review because of Kelly's preoccupation with the "sample flatness" issue. Trivial episodes of unpleasantness or admonition, or other *de minimis* employment actions, standing alone, cannot supply legally sufficient evidence of actionable material discipline or retaliation, even if they were arguably impelled by protected activity. *See, e.g., Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002) (explaining that an "adverse employment action" in the Title VII context requires an adverse alteration in a significant term or condition of employment, such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.") (*quoting Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)); *see also Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).

Accordingly, the trial court's adverse summary adjudication of Kelly's "whistleblower" cause of action was legally compelled on the subject record, because the plaintiff had proffered insufficient evidence that the defendant had materially punished him for having undertaken any activity protected by that statute.[9]

---

[9]On review, the plaintiff has alternatively maintained that he *also* suspected that Lambda had violated Ohio's law against criminal fraud by falsifying its internal documentation to delete (1) any reference to the long-term testing procedure problem, and (2) Kelly's advisories that the procedure should be improved and that customers including GEND should be notified of the issue. *See* Ohio Rev. Code § 2913.01. Allegedly, that suspicion reasonably survived

No. 02-3035
*Kelly v. Lambda Research, Inc.*

For the same reasons, Kelly's state-law claim for employment discharge or discipline in violation of Ohio public policy must be summarily rejected, because, during trial court proceedings, the plaintiff had buttressed that claim solely by reference to the state public policy advanced by the Whistleblower Statute. *See Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 328-29 (Ohio 1997). As developed above, as a matter of law, the plaintiff could not prove that the defendant violated the Whistleblower Act. Nevertheless, Kelly has argued that the legislatively-safeguarded *public policy* protecting whistleblowers from retaliatory discharge or discipline supports his *common law cause of action* irrespective of his inability to satisfy the technical elemental requirements of the Whistleblower Statute.[10]

---

the NRC's December 16, 1999 report and letter, because even if Lambda had not impinged 10 C.F.R. 21, it still may have committed state law felonious "fraud by deception" because, allegedly, customers or prospective customers of Lambda were occasionally permitted access to its internal QA Reports. Consequently, the plaintiff has argued that, because his alleged reasonable suspicion that Lambda had committed criminal fraud remained viable in February 2000, all of the alleged acts of retaliation and/or discipline which transpired during that month support his "whistleblower" claim.

     The plaintiff inadequately framed that argument before the district court, and thus has forfeited it. The appellate court can, in its discretion, excuse a procedurally defaulted argument *only if* the district judge had committed "plain error" by failing to address the matter *sua sponte* irrespective of the plaintiff's neglect. "Under that test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631-32 (2002). (Citations and brackets omitted). Because this reviewing court concludes that the trial judge did not commit "plain error" by failing to develop Kelly's "criminal fraud" theory for him -- a claim which, at bottom, was facially substantively misconceived for reasons including Kelly's failure to sufficiently develop it in either his written report(s) to Lambda or in his written report to the NRC (or in a written report to any other appropriate law enforcement agency) -- it cannot set aside his procedural forfeiture of that contention.

[10]*Compare Pytlinski v. Brocar Products, Inc.*, 760 N.E.2d 385 (Ohio 2002) (resolving that a former employee who was fired for filing an OSHA complaint may prosecute a common law claim for employment discharge in violation of public policy even though his statutory "whistleblower" claim was time barred) *with Wiles v. Medina Auto Parts*, 773 N.E.2d 526 (Ohio 2002) (pronouncing that, in Ohio, employees are generally terminable at will; where statutory remedies, such as those provided by the federal Family and Medical Leave Act, are adequate to insulate an at-will employee from illegal discipline, no supplemental public policy claim should be available to that at-will employee).

No. 02-3035
*Kelly v. Lambda Research, Inc.*

The plaintiff's assertion was ill formulated. In the case *instanter*, the evidence, when construed most favorably for Kelly, could not support a finding that, at the time that Kelly sustained his alleged material punishments for his "whistleblower" activities – namely his post-December 16, 1999 employer admonitions, release from supervisory duties, and alleged ultimate constructive discharge – that he was protected either by the letter *or the spirit* of the state public policy undergirding the Whistleblower Law. As evolved herein, by February 2000, when the alleged employer's serious acts of discipline and retaliation, as well the plaintiff's actions which had incited those responses, took place, Kelly knew that his conduct was not substantively protected by the Whistleblower Act. Ohio public policy does *not* protect an uncooperative employee who *unjustifiably complains* to management or the authorities about non-existent employer misconduct; to the contrary, *Ohio law expressly stipulates that such recalcitrant employees may lawfully be disciplined or discharged. See* Ohio Rev. Code § 4113.52(C).

Therefore, even *assuming*, without deciding, that, in a proper case, an Ohio plaintiff could prosecute a public policy claim for wrongful dismissal or discipline animated by his or her "good faith" "whistleblower"-like activities *even if* he or she failed to fulfill all *substantive* technical requisites of Whistleblower Act protection, on the rationale that sound public policy is advanced by encouraging "good faith" whistleblowing, Kelly's public policy cause of action nonetheless must be discarded, because, on the subject evidentiary record, it is beyond controversy that Kelly objectively lacked any "good faith" contemporaneous belief that his actions which precipitated his alleged discipline actually furthered the broader Ohio public policy encompassed by the Whistleblower Statute.[11]

---

[11]On appeal, the claimant has insisted that a rational jury could find that his termination offended *additional* Ohio public policies beyond the protection of "whistleblowers," including the encouragement of overall honesty in business dealings, to the extent that a jury allegedly could reasonably conclude that Lambda disciplined and constructively cashiered Kelly in February 2000 because he would not cooperate with Lambda's scheme to defraud its clients by

- 18 -

No. 02-3035
*Kelly v. Lambda Research, Inc.*

Accordingly, the district court's final summary judgment dismissing Kelly's claims against

Lambda is **AFFIRMED**.

---

concealing from them possible defective workmanship and/or the unreliability of Lambda-furnished engineering data. *See, e.g., Collins v. Rizkana*, 652 N.E.2d 653 (Ohio 1995) (propounding that public policy shields an employee from termination for refusing to cooperate with the employer in perpetrating illegal or immoral acts).

However, by neglecting to properly pose it below, Kelly has forfeited the argument that the furtherance of any public policy, other than the encouragement of good-faith "whistleblowing," invalidated his alleged employment discipline. Because it was not "plain error" for the trial adjudicator not to consider *sua sponte* additional public policies which might be negatively impacted by Kelly's discipline, this reviewing court cannot excuse the plaintiff's procedural default. *See* note 9. At any rate, even if the claimant had preserved that contention before the trial court, it would be amenable to summary dismissal, because the record evidence could not support a finding that Lambda had asked Kelly to do anything illegal or which might materially deceive any person in a manner tantamount to fraud or theft.

No. 02-3035
*Kelly v. Lambda Research, Inc.*

**BOGGS, Chief Judge, concurring**. I concur in the judgment, but write separately to elaborate briefly on two points. Kelly bases his reading of Ohio's Whistleblower Act, Ohio Rev. Code § 4113.52, on an unpublished Ohio appellate court opinion: *O'Brien v. Libbey Owens Ford Co.*, No. L-96-333, 1997 WL 679522, at *2 (Ohio App. Oct. 31, 1997). We therefore may properly reject his interpretation of the statute that the employee must have a good faith belief that the employer is creating a "hazard to public safety" *or* is engaged in a crime. We should also note, however, that this court and an Ohio appellate court have both determined that protection under Ohio's Whistleblower Act is only triggered when an employee has a good faith belief that a criminal violation has occurred. *Doody v. Centerior Energy Corp.*, 739 N.E.2d 851, 855 (Ohio App. 2000); *Brooks v. Martin Marietta Utility Services Inc.*, No. 97-4068, 1998 WL 739890, at *5 (6th Cir. Oct. 8, 1998) (unpublished opinion). Therefore, another clear ground exists for rejecting Kelly's contention that a good faith concern about public safety was sufficient to qualify for protection under the Ohio Whistleblower Statute.

I also concur in the conclusion that Kelly may not at this late stage point to additional safety concerns that he might have had in order to bolster his *Greeley* claim and distinguish it from his unsuccessful Whistleblower claim. Because Kelly treated them as identical claims in the district court, we must do the same on appeal. Even if we were to consider the *Greeley* claim separately, Kelly could not meet the causation element of a *Greeley* claim because he has not shown that he was fired for reporting Lambda to the Nuclear Regulatory Commission; even assuming, *arguendo*, that he was constructively discharged, the record shows that action was the culmination of a long-standing personality conflict, of which the NRC report was just one aspect. I believe, however, that it remains an open question whether a plaintiff may have a meritorious *Greeley* claim, even if he has not strictly

- 20 -

*No. 02-3035*
*Kelly v. Lambda Research, Inc.*

complied with the requirements of the Whistleblower Act;  in fact, the Ohio Supreme Court seems to

have approved this possibility:  "appellant is entitled to maintain a *Greeley* claim against appellees

whether or not he complied with the dictates of R.C. 4113.52 [the Whistleblower Statute]." *Kulch v.*

*Structural Fibers*, 677 N.E.2d 308, 328-29 (Ohio 1977).  Therefore, we treat the two claims as identical

only because of the way this particular case was litigated.